UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

————————————————————————————

|  |  |  |
|---|---|---|
| HIGROUND CO., LTD. and<br>HIGROUND PTE. LTD., | : | |
| | : | |
| Plaintiffs, | : | Civil Action No: 1:23-cv-08618-JSR |
| | : | |
| -against- | : | **FIRST AMENDED** |
| | : | **VERIFIED COMPLAINT** |
| HENRY HAN-WOONG LEE, | : | |
| GENESIS DIGITAL ASSETS PTE. LTD., | : | |
| GENESIS GROUP PARTNERS, LLC, | : | |
| NEON PARTNERS, LLC, | : | |
| NEON PARTNERS LLC, and | : | |
| GENESIS-NEON GROUP, LLC, | : | |
| | : | |
| Defendants. | : | |

————————————————————————————

Plaintiffs HIGROUND CO., LTD. ("HCL") and HIGROUND PTE. LTD. ("HPL")

(collectively "Plaintiffs" or "Higround") as and for their First Amended Verified Complaint

against Defendants HENRY HAN-WOONG LEE, GENESIS DIGITAL ASSETS PTE. LTD.,

GENESIS GROUP PARTNERS, LLC, NEON PARTNERS, LLC, and GENESIS-NEON

GROUP, LLC, (collectively "Defendants") allege as follows:

## PRELIMINARY STATEMENT

1. On or about April 25, 2019, Plaintiffs loaned Five Million dollars ($5,000,000) to be repaid

   on May 24, 2022.  Prior to the execution of the loan agreement, defendant Henry Han-

   Woong Lee created documents that were executed by Plaintiffs which were designed to

   defraud Plaintiffs without their knowledge.

2. In order to induce Plaintiffs to provide the loan, Defendants acted in concert to defraud

   Plaintiffs by creating shell companies and false documents and records.  Defendants' such

   schemes were carried out internationally in four different countries.

3. Demand was duly made for the repayment of the loan in full.  To date, there is still an outstanding balance of $4,750,000.

4. This action seeks damages and all other available legal relief arising from wrongful conduct by Defendants and their co-conspirators including but not limited to, in the alternative, their breach of loan agreement and guaranty, their common law fraudulent representations, their statutory acts of racketeering and their acts of statutory securities fraud, as well as other causes of action set forth herein. A copy of the Term Loan Agreement between GDA and Higround, dated April 25, 2019, is annexed hereto as Exhibit A. Copies of the Joint Venture Agreement and Loan Collateral Agreement between Defendants GDA and Stonefort, both dated March 27, 2019,[1]  are annexed hereto as Exhibits B and C.

## JURISDICTION AND VENUE

5. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because Plaintiff seeks a judgment for Defendant's violation of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and SEC Rule 10b-5, 17 C.F.R. § 240.10b-5, Section 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. § 78t(a) thereunder.

6. Venue is proper in this District pursuant to 28 U.S.C. §1391(b) because Defendant Lee resides in this District and is subject to personal jurisdiction and venue in this District.

## PARTIES

7. Plaintiff HCL is a limited corporation existing under the laws of the Republic of Korea with its address at 42, Donggyo-ro 17-gil, Mapo-gu, Seoul, Korea.  HCL is in the motion picture and video industries and produces and distributes media programs, including popular Korean

[1]Personal identifying data and trade secrets have been redacted from all exhibits.

2

dramas on Netflix. It is an affiliated company of BRV Lotus Growth Fund 2015, L.P. in

Cayman Islands. And it is affiliated with BlueRun Ventures ("BRV"). BRV has a subsidiary

in Korea and is headquartered in 545 Middlefield Rd #250, Menlo Park, CA 94025, United

States.

8.   HPL is a limited corporation existing under the laws of Singapore with its address at 60 Paya

Lebar Road, #08-13, Paya Lebar Square, Singapore 409051.

9.   Defendant Henry Han-Woong Lee ("Lee") is a director and owner of Defendant GDA.

Defendant Lee is a citizen of the United States with his address at 350 W 42nd Street Apt.

18K, New York, NY 10036-6954.  He is a graduate of NYU's Stern School of Business and

held himself out as a financial expert. On April 10, 2019, Lee was appointed as a director of

GDA owning 1 stock of ordinary class of share with the value of $1 USD.  Lee also owns

Invensys Fund which is registered at 36-38 Grand Rue, L-1660, Luxembourg Grand Duchy

of Luxembourg ("Invensys Fund"), and Genesis-Neon Holdings, LLC ("Genesis-Neon"),

which is registered in Sharjah Media City, Sharjah, United Arab Emirates.  Lee also oversees

the strategy and finance of   Defendant Neon Partners, the investment management division

of Defendant Genesis Group, and the operations of Defendant GNG, and is authorized to sign

on their behalf. Upon information and belief, Lee personally does business from the address

1250 Broadway, 36th Floor, New York, NY 10001.   Lee is also sued in his representative

capacity as president and or treasurer of defendants Genesis Group, the Neon Partners

entities and GNG to the extent those entities are unincorporated associations or partnership

rather than corporations as represented to Plaintiffs.

10.  Genesis Digital Assets PTE. LTD. ("GDA") is a private limited company, incorporated on

April 10, 2019, in Singapore. Its address is 1 Goldhill Plaza, #03-39, Goldhill Plaza,

Singapore 308899.  The company's paid-up capital is $1 USD.  GDA started its transaction activity on January 3, 2019.

11. Upon information and belief, defendant Genesis Group Partners LLC ("Genesis Group") is a limited liability company organized and doing business in the State of New York, sharing offices with its affiliate, GNG, located at 1250 Broadway, 36th Floor, New York, NY 10001. To the extent it is an unincorporated association and/or partnership it is sued herein by suing Lee, its member, partner, president and/or treasurer, in his representative capacity.

12. Upon information and belief, Defendant Neon Partners, LLC is a limited liability company or unincorporated association or partnership organized under the laws of the State of Delaware and actively doing business in the State of New York, sharing offices with its affiliate GNG located at 1250 Broadway, 36th Floor, New York, NY 10001.  To the extent it is an unincorporated association and/or partnership it is sued herein by suing   Lee, its partner, president and/or treasurer, in his representative capacity.

13. Upon information and belief, Defendant Neon Partners LLC is a limited liability company or unincorporated association or partnership organized under the laws of the State of Delaware and actively doing business in the State of New York, sharing offices with its affiliate GNG located at 1250 Broadway, 36th Floor, New York, NY 10001.  To the extent it is an unincorporated association and/or partnership it is sued herein by suing Lee, its partner, president and/or treasurer, in his representative capacity.

14. Upon information and belief, Genesis-Neon Group, LLC ("GNG"), is a limited liability company or unincorporated association or partnership organized under the laws of the State of Delaware or and actively doing business in the State of New York, sharing offices with its affiliates Neon Partners and Genesis Group located at 1250 Broadway, 36th Floor, New York,

NY 10001.  To the extent it is an unincorporated association and/or partnership it is sued

herein by suing   Lee, its partner, president and/or treasurer, in his representative capacity.

## **FACTUAL ALLEGATIONS**

15. Lee, upon information and belief, lives in New York City and is a director and owner of

    GDA.  Lee established   GDA in Singapore on April 9, 2019.  It is inactive, and according to

    the Accounting and Corporate Regulatory Authority of Singapore, its capital is reported to be

    only $1 USD. It is a shell company.

16. HPL was also organized under the laws of Singapore in April 2019. After being solicited by

    Lee, on April 25, 2019, HPL executed a term loan to GDA for $5 million USD (the "Loan")

    under a term loan agreement (the "Term Loan Agreement"), with a maturity date of May 24,

    2022.

17. Thereafter, Defendants, acting through Lee, created an elaborate scheme and established a

    complex, international network of numerous companies, including but not limited to GDA.

    Such scheme was created in order to conceal the existence of securities transactions and to

    induce Plaintiffs to provide funds through the Term Loan Agreement and thereby to provide

    funding for a digital assets license ("DAL") which would give Plaintiffs certain contents

    distribution rights in the southeast Asia and the middle east. All of the Defendants conspired

    amongst one another to achieve this goal.

18. Lee initially promised that he would obtain the DAL, thereby expanding Plaintiffs' business

    into foreign markets and allowing Plaintiffs to receive periodic interest plus the loan

    principal at maturity. Plaintiffs relied on these specific representations as the basis upon

    which to make the Loan.

19. From the beginning, however, Defendants Lee, GDA, and, among others, a company called Stonefort Consultants FZC ("Stonefort"), acting in concert, never intended to repay the Loan. Unbeknownst to Plaintiffs, even before any loan documents were presented to Plaintiffs, Lee duped HCL into signing a consulting services agreement which rendered the subsequent Loan to become an investment agreement; that is, Plaintiffs would share profits if the undertaking proved to be successful enough for the borrowers to decide to share the profits, but Plaintiffs would lose their entire investment otherwise.

20. In order to induce Plaintiffs to extend the Loan, Lee promised Plaintiffs that with the DAL, he would seek film production and/or distribution opportunities for Plaintiffs in the countries which comprise of the Association of Southeast Asian Nations ("ASEAN"), in the Middle East, and ultimately in the U.S., despite not having any intention to do so.

21. Defendants Lee, GDA, and Stonefort informed Plaintiffs that securing media and film production opportunities through the DAL would help Plaintiffs' business and guarantee payment of any indebtedness to Higround.  They also promised to share with Plaintiffs their profits from their investment in DAL.

22. Contrary to these statements, however, Defendants Lee, GDA, and Stonefort never secured media or film production opportunities, nor followed through with any of the agreements they entered into among themselves.

23. Defendant Lee, acting in his personal capacity and on behalf of GDA and Stonefort, sent a series of transactional emails and documents to Plaintiffs, stating that their goal was to use the Global Blockchain Foundation to market Higround's content worldwide on emerging technology platforms, and toward this goal, Defendants GDA and Stonefort made a fictitious

loan collateral agreement ("Loan Collateral Agreement) and a joint venture agreement on

March 27, 2019 ("Joint Venture Agreement") to be relied on by Plaintiffs at a later date.

24. The stated purpose of the Loan Collateral Agreement and Joint Venture Agreement was,

among other things, to explore media and film production opportunities in the ASEAN

countries and in the Persian Gulf region for Plaintiffs.

25. However, none of this was ever intended by Defendants GDA and Stonefort, and no work

was ever performed by either of them pursuant to the Loan Collateral Agreement or Joint

Venture Agreement.

26. Because Lee reassured Plaintiffs with series of ostensibly significant supporting

documentation, Plaintiff Higround believed and relied on Defendants GDA and Stonefort's

representations as to their industry experience and assurances that the investment in the DAL

would ensure their media business's success.

27. Higround further relied on GDA and Stonefort's representations that the investment would be

collateralized by Stonefort.

28. In the Collateral Agreement and Joint Venture Agreement, Stonefort was described as having

substantial experience in the entertainment industry and the business of media distribution

and marketing, and media content distribution in particular.

29. However, upon information and belief, Stonefort was not in such a business, but only had a

business in asset management and general trading. Stonefort owns 100% of Invensys

Investments LTD, established in 2008, which in turn owns 100% of Invensys Finance

Investments LLC, established in April 2019. The main business of both companies was asset

management, general trading, and finance brokering. *See* Exhibit E.

30. By May 28, 2019, Plaintiffs had transferred the sum of $5 Million USD to Defendants to be repaid on May 24, 2022, but as of July 2023, Defendants had only returned a total of $1,267,698.79.

31. Despite numerous demands, GDA has not repaid roughly $4.75M USD. Repayment was guaranteed by Lee's U.S.-based company, GNG, and its U.S.-based affiliates, Genesis Group and Neon Partners, LLC, and Neon Partners LLC (together "Neon Partners") as well as Lee himself, who did business in his personal capacity as an affiliate, as well, separately, as by Lee directly in his personal capacity.  But these guarantors have also failed and refused to make payment.  The events which took place are described below in detail.

## FACTS

32. On April 15, 2019, Lee sent an email to Jung Han Woo ("Woo"), a managing partner of BlueRun Ventures ("BRV") in Korea, to suggest making a general consulting agreement between GDA and Higround ("Consulting Services Agreement"). BRV is an affiliated company of Higround.  The scope of  GDA's work would be to provide general business and investment strategies for Higround in line with and in support of Higround's growth objectives. The compensation method would be determined periodically on a project basis including general loans, cash remuneration and other means agreeable to both parties. *See* Exhibit K.

33. On April 16, 2019, in an email to  Lee and others, Woo stated: "regarding a request for drafting a consulting and loan contract for Higround Pte., which will be made after the bridge loan I mentioned, Lee recommended us to make a legal document between the firm that will receive the loan and Higround Pte. I will explain it further to you orally later." *See* Exhibit K.

34. The Consulting Services Agreement was signed by both Higround and GDA. *See* Exhibit S.

35. Shortly thereafter, on May 9, 2019, Lee directed and recommended that Plaintiff HCL lend
$5 Million USD to   GDA for a license deposit for the benefit of   GDA. *See* Exhibit H.   Lee
promised that   GDA would buy the DAL with the money and return profits as a form of
interest from the loan made by Higround.   Lee also promised that with the license, Plaintiff's
business opportunities and profits would expand.

36.   Per the Term Loan Agreement's terms, GDA would borrow $5 million USD with interest at a
rate of 7% per annum. The re-payment due date was May 24, 2022.  Fees due in the event of
default were 10% per annum or the maximum rate allowed by law, whichever was less.
GDA agreed to pay all costs incurred by Higround in collecting sums due after a default,
including reasonable attorneys' fees.  Lee signed as director on behalf of GDA. *See* Exhibit
A.

37. On May 11, 2019, Lee issued a guaranty agreement on the letterhead of "Neon Partners" on
behalf of himself and his U.S. companies, including but not limited to GNG, Neon Partners
and Genesis Group. His signature block on the guaranty agreement bears the date May 10,
2019.   He emailed the agreement to Plaintiff on May 11, 2019. *See* Exhibit I.

38. The email bore the heading "Re: Guaranty for Genesis Digital Assets Pte. Ltd." and was sent
to Higround and its director, Hae-Suk Chung ("Chung"), confirming an "umbrella guaranty"
on behalf of Lee's American business and himself.

39.   Lee, himself based in the U.S., having full legal authority to do so, committed GNG and its
affiliates ("Guarantors"), U.S. based companies including Neon Partners and Genesis Group,
to guarantee full payment on the Term Loan Agreement and pay Higround on demand any
sum which may become due.

40. The parties understood and intended that the term "affiliates" meant all the parents, sisters and subsidiaries of GNG, which were owned, operated and/or controlled by Lee and on whose behalf he had authority to sign, including but not limited to himself, Neon Partners and Genesis Group as well as GNG itself.

41. Lee was required to extend a personal guaranty not just as an "affiliate" of GNG but also directly. This was a condition precedent of Higround releasing funds to his companies.

42. On May 14, 2019, Higround delivered $1,500,000 USD from a bank in Singapore to GDA by transferring it to Stonefort for the benefit of GDA under GDA's instructions.

43. On May 28, 2019, Higround delivered $3,500,000 USD from a bank in Singapore to GDA by transferring it to Stonefort for the benefit of GDA under GDA's instructions.

44. On July 31, 2019, Lee emailed Woo stating that the goal for Plaintiff's investment in the DAL was for Higround to become a "premier leader" in (a) Korea media content creation; (b) cross-border media content creation with K-pop mixed local synergies; (c) dynamic distribution of Higround Korea's content utilizing strong local media and political relationships in Southeast Asia first and the Middle East and Europe/USA thereafter; (d) innovative utilization of blockchain technology to grow Higround's business not just in Korea, but globally (with the Global Blockchain Foundation to market Higround Korea content worldwide on emerging technology platforms). *See* Exhibit L.

45. In the same email, Lee also asked Plaintiffs not to mention the "IC Memo" to BRV, stating: "Please don't mention the 'broker-dealer and asset management firm' to BRV people. It'll ignite automatic intense, needless due diligence. The project manager may get tempted to accuse of management negligence and potentially fraud since these are not related to Higround's business."

46. Although Chung and Woo found the email odd and felt very uncomfortable about its surreptitious appearance, Lee reassured them by stating in the email that a General Partner of Neon Partners guaranteed the amount of the Loan, and since the Loan had already been disbursed by that time, Higround followed Lee's instruction and did not share the acquired information.

47. On October 23, 2020, the parties entered into a payment agreement which modified the Term Loan Agreement and agreed to choose New York for its jurisdiction for any disputes regarding the Term Loan Agreement. *See* Exhibit G.

**A. Defendants GNG, Lee, Genesis Group, Neon partners and GNG's other affiliates guaranteed the repayment of the Loan, and   Lee guaranteed the Loan in his individual capacity.**

48. As noted above, in order to reassure Higround and avoid questions about liability and other risks from Higround, Lee emailed a written guaranty on May 11, 2019, with the heading "Re: Guaranty for Genesis Digital Assets Pte. Ltd." to Chung and Higround. The written guaranty stated, "I do hereby waive notice of default, nonpayment and notice thereof and consent to any modification or renewal of the credit agreement hereby guaranteed." *See* Exhibit I.  His use of this first-person language was intended by all the parties to convey that in addition to extending a guaranty of the repayment of the funds as an affiliate of GNG, Lee was also extending a guaranty directly in his personal capacity, for the elimination of all doubt.

49.   Lee issued the written guaranty with his printed individual name, "Henry H. Lee," expressing both a personal guaranty and the binding of the GNG affiliates he was authorized to sign for.  Lee also wrote his U.S. passport number above his signature to further emphasize for his personal guaranty this personal guaranty.  His doing so was intended by all the parties to convey that in addition to extending a guaranty of the repayment of the funds as an

affiliate of GNG, Lee was also extending a guaranty directly in his personal capacity, for the elimination of all doubt.

50. In the May 11, 2019, guaranty, Lee stated that GNG and its affiliates ("Guarantor") were guarantying repayment. He stated that GNG's offices were located at 1250 Broadway, New York, NY 10001, the same offices held by Genesis Group, Neon Partners and Lee himself, as alleged herein, because they were all affiliates.  The guaranty was printed on the letterhead of Neon Partners. The guaranty was unconditional and continuing and irrevocable.

51. In February 2021, a Loan Modification and Collateral Agreement ("February 2021 Loan Modification and Collateral Agreement") was expected to be executed reconfirming the liability of Guarantor. *See* Exhibit D.

52. Under this agreement, the stated collateral for the Loan was the pledge of six million seven hundred thirty thousand (6,730,000) outstanding shares of common stock of Jules Corporation by Jonathan Chan, the founder and CEO of Jules Corporation.  Additionally in this agreement, the parties agreed to the exclusive jurisdiction of the state or federal courts located within New York County, New York for any disputes arising in connection with the agreement. *See* Exhibit D.   GDA also designated Scott Hur, Esq. at Hur, Lash & Choe, LLP as counsel. *See* Exhibit D.

53. Plaintiffs relied on numerous documents   Lee sent regarding the value of stocks of Jules Corporation, the pledge of shares of Jules Corporation by Chan, and promises by   Lee that they would soon be executed.

**B. In order to disguise the fraudulent scheme, GDA and Stonefort entered into the Loan Collateral and Joint Venture Agreements in an apparent attempt to convince Higround**

**that they were planning to secure rights in media and film production projects, which would purportedly add value to their companies.**

54. On March 27, 2019, prior to the Term Loan Agreement, GDA and Stonefort entered into the Loan Collateral Agreement. *See* Exhibit C.

55. In the Loan Collateral Agreement, GDA and Stonefort agreed to guarantee their respective obligations, as specified and agreed to in the Joint Venture Agreement.  *See* Exhibit C.

56. Both parties agreed not to sell or transfer ownership of the collateral specified in the Loan Collateral Agreement until the Loan from Higround has been fully repaid. *See* Exhibit C, 2.1.4.

57. The agreement also provided that "should GDA default on Loan, Higround shall have the right to seize the listed collateral and resell it to recoup their lost investments." *See* Exhibit C, 2.1.5.

58.  Lee sent the Loan Collateral Agreement to Higround to emphasize the purported protection it would afford Higround.

59. However, Stonefort never provided, nor intended to provide, the collateral as specified in the Loan Collateral Agreement.

60. That same day on March 27, 2019, Defendants GDA and Stonefort also entered into the Joint Venture Agreement.  Under the Joint Venture Agreement, Stonefort was responsible for securing relevant rights (including ownership or licensing rights) in film works and/or film production projects in the ASEAN countries and Gulf region. *See* Exhibit B, 2.1.1.

61. Had this Joint Venture Agreement been carried out as agreed, Higround would have established relationships with various media companies and likely partnered with them, thereby enhancing its business and increasing the value of its company.

62. Upon information and belief, Stonefort neither secured nor tried to secure any rights in film works.

63. Higround later learned that from its incorporation in 2019 until April 5, 2022, GDA had been dormant. *See* Exhibit J.

64. Moreover, Defendants Lee and GDA collaborated with each other to frustrate Plaintiffs' efforts to obtain repayment under the Term Loan Agreement, causing a delay that led to Plaintiffs' detriment.

65. Defendants never intended to return much of the investment or the Loan.

66. However, to fend off immediate action by Plaintiffs, Defendants have returned a total of $1,267,698.79 USD in the years since the Term Loan Agreement was executed.

67. For example, on April 26, 2021, Lee sent $499,990 to Plaintiff through Hur, Lash & Choe, LLP, which was located at 600 Sylvan Ave. Ste. 109, Englewood Cliffs, New Jersey, 07632. *See* Exhibit P.

68. On May 17, 2021, Lee additionally sent $249,990 to Plaintiff through Hur, Lash & Choe, LLP. *See* Exhibit P.

69. During this time, Defendants also created and provided multiple Loan reaffirmations to Plaintiff, confirming and reconfirming the final Loan amount and interest due.

70. During this time, Defendants manipulated and provided false information to Plaintiffs by amending the Loan Term Agreement and fabricating supporting documents to induce Plaintiffs' continued reliance on the Loan and mislead Plaintiffs into believing that Defendants would return their money.

71. Relying on various representations and alleged promises that repayment was imminent, Plaintiffs continuously deferred taking action against Defendants, reduced interest and

extended the maturity date.  To instill false confidence in their ability and intent to repay the

Loan, Defendants provided the following to Plaintiffs:

a. On or about February 19, 2021, Lee provided an agreement letter from Chan, the CEO

of Jules Corporation in Singapore, to Plaintiffs, pledging Chan's six million seven

hundred thirty thousand (6,730,000) shares of outstanding common stock of Jules

Corporation as collateral to ensure the prompt payment of the Loan under the Term Loan

Agreement. *See* Exhibit D.

b. In a letter addressed to Plaintiff Higround Pte., Chan stated, "I personally own the

shares being pledged as the Collateral [and] confirm my commitment to assist in the

transfer of Collateral to [Higround Pte.] should it be necessary." Chan also made the

following representations and "confirmation of support" for GDA:

> 1. I have an understanding with [GDA] regarding the Collateral
> Agreement and the contents thereof;
> 2. Jules Corporation has received necessary approvals for the listing of
> Jules Corporation with public equity valuation at listing of between US$80
> – 100 million;
> 3. The Collateral will be transferred to [Higround Pte.] with cooperation of
> Jules Corporation should it be required in accordance with the Collateral
> Agreement; and
> 4. Borrower intends to satisfy the payment obligations related to the loan
> by the maturity date.

*See* Exhibit Q.

c. Chan's letter goes on further to state that "this expression of support demonstrates the

strong and complimentary relationship that we have maintained with Borrower over the

years."  *See* Exhibit Q.

d. Upon information and belief, Chan never intended to pledge any shares nor

collateralize anything toward the Loan; rather, Chan knowingly and/or negligently

allowed Lee to use Chan and Jules Corporation's names, thereby conspiring with Lee for the purpose of perpetrating fraud upon Plaintiffs.

e. Based on the February 2021 Loan Modification and Collateral Agreement, together with the letter dated February 19, 2021, Plaintiffs were convinced that the Loan was safely secured and would be fully repaid. Thereafter, Plaintiffs succumbed to Lee's request for extension and change of the loan maturity date and loan terms.

f. On May 13, 2021, Plaintiff agreed to lower the interest and default payment to $250,000 USD and agreed to a payment within three business days.

g. On May 20 and May 27, 2021, Plaintiff again agreed to extend the payment date and change the payment terms.

h. On July 8, 2021, Lee forwarded a letter to Higround that he had purportedly received from Michael Bangash, a managing partner of West Ranch Capital Management ("WRCM"). The letter stated that Neon Partners had sought a bridge finance loan for its operational needs and executed an agreement with WRCM.  *See* Exhibit O.

i. Questionably, Michael Bangash is also a chairman of Neon Partners.

j. In the letter, WRCM agreed to the following terms:

> Put-option value of the underlying asset not to exceed ("Value"): $5.25 million.
> Activation date ("Activation Date"): 30 days from the Signature date
> Put-option valuation lock-in period ("Lock-In Period"): 60 days from the
> Activation Date." ("Put Option Counter-Party Agreement").
> Put Option Counter-Party Agreement was executed by Michael Bangash on July
> 8, 2021.

*See* Exhibit O.

k. Plaintiffs were told that once Neon Partners received a bridge finance loan from WRCM, it would be used to pay off the Loan.

l. Unsurprisingly, this never happened.  There was no bridge finance loan, and it remains to be seen if any such loan application was even made or any such agreement executed.

m. Upon information and belief, WRCM never made any bridge finance loan to Neon Partners nor paid any portion thereof to Plaintiffs.

n. Michael Bangash and WRCM knew or should have known that the Put Option Counter-Party Agreement would be relied on by the third party, Plaintiffs. Indeed, WRCM had no intention of supplying any financial support to Neon Partners.

o. On April 5, 2022, Plaintiffs and Lee agreed to alter "2. Due Date" of the Term Loan Agreement dated April 25, 2019, and to negotiate postponement the loan repayment schedule for the Term Loan Agreement and amendment dated March 7, 2020, because the pandemic had affected Defendant's business and initial plan of distributing content. *See* Exhibit R.

p. On April 8, 2022, Petra Eco Build Sdn Bhd ("Petra Eco"), a limited company incorporated in Malaysia, and GDA made a loan agreement for $5 Million USD with two years of maturity ("Petra Loan Agreement").

q.  Lee was the primary principal for this transaction. As in WRCM, Defendants Lee, Petra Eco, GDA knew and agreed that any money received through this Loan Agreement would be used to pay off the Loan.

r. The Petra Loan Agreement stated that $5 Million would be funded on:

> April 15, 2022 with up to seven Singapore banking day disbursement window period thereafter pending regulatory approvals including Central Bank international wires. Disbursement shall be confirmed within 48 hours of regulatory and remittance approvals as time is of the essence.

s. Again, no funding was established in April or May of 2022.

t. On November 3, 2022, Petra Eco wrote a letter to   GDA ("November-3 Petra Eco

Letter") stating the following:

> This communication affirms the definitive commitment of the [Petra Eco] to
> promptly fund the agreed loan of approximately 5 million dollars to [GDA].
> The funding with borrower will be done promptly, within 7 banking days of
> closing by the Disclosing Party with a private debt facility, Islamic Development
> Bank or any other funding source, with commitment for best-efforts execution
> and negotiation of required agreements and financing documents within a 1.5 -
> 2.5 weeks window.

*See* Exhibit M.

u. In reliance upon the representations set forth in this letter, on November 4, 2022,

Chung, Higround's director, sent the November-3 Petra Eco Letter as an attachment to an

internal company email, stating that it was a letter from Petra agreeing to provide a loan

within 2 weeks. *See* Exhibit N.

v. Yet again, there was no funding of any kind from Petra Eco during that time.

72. On December 19, 2022, based on numerous loan reaffirmations and amendments to the Loan

Agreement provided by   Lee, Plaintiffs sent out a "Last Overdue Account Reminder"

whereby demand was made by Plaintiffs that the "loan in the amount of $4,750,000" plus

interest be paid by "December 26, 2022". *See* Exhibit N.

73. On December 21, 2022, Chung sent an email to Lee to request a confidence letter or   Lee's

sincere action that the Loan would be repaid. Chung requested at least a partial repayment, or

at least in the alternative a bi-annual financial report from Defendants GDA, Neon Partners,

or Stonefort. *See* Exhibit N.

74. Subsequently, on January 6, 2023, Plaintiff Higround sent an email to   Lee requesting

information about when and how the loan would be repaid and whether any repayment

progress had been made, and seeking clarification as to when Petra Eco's loan would close. Higround requested a reply by January 10, 2023. *See* Exhibit N.

75. In the same email thread, Lee emailed Plaintiffs stating, "per our discussion, GDA is in the process of working to arrange for the $4.75 million agreed outstanding repayment amount and working towards closing." *See* Exhibit N.

76. As of July 2023, Plaintiff has not received any payment against the Loan in the amount of $4.75 million from   Lee and/or   GDA and/or its affiliates, and all Defendants have been silent and non-responsive to any and all communication by Plaintiffs. Therefore, no further negotiation pertaining to the loan repayment schedule, as agreed on April 5, 2022, could be held.

**Maintenance of Business Address in New York City by Genesis Group and Neon Partners**

77.   Genesis Group and Neon Partners, at all times pertinent herein, maintained their business headquarters at 1250 Broadway, 36th Fl., New York, NY, 10001, and as shown below shared this location with GNG, their affiliate. All three companies were owned, operated and controlled by Lee.

78.   Genesis Group maintained a website at

https://genesisgrouppartners.com/author/gengroup212/

which displayed this address prominently.  See Exhibit U attached hereto.

79.   Genesis Group maintained a Google listing which displayed this address.  See Exhibit V attached hereto.

80.   Neon Partners is represented on the same website as the joint operator with the same address.  See Exhibit W attached hereto.

81. Neon Partners maintained a website with Genesis Group which displayed this address.  See Exhibit X attached hereto.

82. Neon Partners maintained a Google listing which displayed this address.  See Exhibit Y attached hereto.

83. Neon Partners letterhead was used to issue the May 11, 2019 guaranty. See Exhibit I.

84. Lee repeatedly represented to Plaintiffs that Genesis Group and Neon Partners operated their business headquarters at the 1250 Broadway address and were affiliates of GNG, as indicated herein.

**Jurisdictional Contacts by Defendants GNG, Genesis Group and Neon Partners**

85. The May 11, 2019, guaranty states that GNG is "located at 1250 Broadway, New York, NY, 10001." See Exhibit I.

86. Though created in Delaware, upon information and belief GNG did little if any business there and was immediately headquartered in New York City, sharing its address with two affiliated companies, Neon Partners and Genesis Group.

87. Operating from its New York City headquarters, GNG and its affiliated companies, Neon Partners and Genesis Group so continuously and systematically maintained their presence as to render them essentially at home in New York and sufficient to subject them to the general jurisdiction of the courts of the State of New York, among other things, maintaining their principal place of business in New York.

88. Further, GNG and its affiliated companies, Neon Partners and Genesis Group carried out actions described herein while operating out of their New York City headquarters, transacting business within the state and entering into contracts to supply goods or services in the state, including but not limited to specific transactions from which the claims stated herein arose,

and it used this headquarters address to establish themselves with Plaintiffs as a reputable

New York City business affiliated with other such businesses, thus subjecting them to the

specific jurisdiction of the courts of the State of New York.

## FIRST CAUSE OF ACTION
### a. Breach of Contract by Plaintiff Higround Pte.
### as Against GDA

89. Plaintiffs repeat and re-allege the foregoing allegations in the preceding paragraphs as if fully

    set forth herein.

90. Defendant entered into contracts with Plaintiffs for loans and the guaranty of loans. HPL

    made a term loan to GDA for $5 million USD under a term loan agreement on April 25,

    2019, with an initial maturity date of May 24, 2022. *See supra* ¶ 36.

91. Plaintiffs fulfilled all obligations under the contracts.

92. On May 14, 2019, Higround delivered $1,500,000 USD from a bank in Singapore to GDA by

    transferring it to Stonefort for the benefit of GDA under GDA's instructions. *See supra* ¶ 42.

93. On May 28, 2019, Higround delivered $3,500,000 USD from a bank in Singapore to GDA by

    transferring it to Stonefort for the benefit of GDA under GDA's instructions. *See supra* ¶ 43.

94.  Defendants GDA and Lee violated and materially breached the terms and conditions of the

    contracts. They failed to use the funds intended for investment to benefit the joint business

    and they failed to repay the loans.

95. Defendant only returned a total of $1,267,698.79 USD in the years since the Term Loan

    Agreement was executed. *See supra* ¶ 66.

96. On April 5, 2022, Plaintiff and Defendant agreed to alter "2. Due Date" of the Term Loan

    Agreement dated April 25, 2019, and to negotiate to postpone the loan repayment schedule

    for the Term Loan Agreement. *See* Exhibit R.

97. However, Defendant has been silent and non-responsive to any and all communication by Plaintiff. Therefore, no further negotiation pertaining to the loan repayment schedule, as agreed on April 5, 2022, could be held. *See supra* ¶ 76.

98. On December 19, 2022, based on numerous loan reaffirmations and amendments to the Loan Agreement, Plaintiff sent out a "Last Overdue Account Reminder" whereby demand was made by Plaintiff that the "loan in the amount of $4,750,000" plus interest be paid by "December 26, 2022". *See* Exhibit N. *See supra* ¶ 72.

99. As of July 2023, Plaintiff has not received any payment against the Loan in the amount of $4.75 million from GDA. *See supra* ¶ 76.

100.    As a result of Defendant's breach, Plaintiff was damaged.

### b. Breach of Contract by Plaintiff Higround Pte.
### as Against Defendants Lee, GNG, Neon Partners and Genesis Group

101. On May 11, 2019, Lee, who was authorized to do so, signed a guaranty of the loan funds issued by Plaintiff to GDA on behalf of GNG, and on behalf of all other GNG affiliates on behalf of whom he was authorized to sign, including but not limited to Genesis Group and Neon Partners and himself, and in his personal capacity. *See supra* ¶ 48.

102. The guaranty stated that GNG and its affiliates agreed to guarantee in full and pay Higround Pte. on demand any sum which may become due whenever GDA shall fail to pay the same. *See supra* ¶ 48-50.

103. The guaranty stated: "I do hereby waive notice of default, nonpayment and notice thereof and consent to any modification or renewal of the credit agreement hereby guaranteed." *See supra* ¶ 48.

104. Since May 17, 2021, GDA has not paid any amount as agreed. *See supra* ¶ 76.

105. Plaintiffs have duly demanded that Defendants GNG, Genesis Group, Neon Partners and Lee satisfy the obligation of GDA which they agreed in writing to guaranty. *See supra* ¶ 72-76.

106. However, Defendants GNG, Genesis Group, Neon Partners and Lee failed to pay Plaintiffs any part of the amount due.

**WHEREFORE**, Plaintiff Higround Pte. respectfully requests that this Court enter a judgment:

    a.   declaring that Defendants have breached their agreements with Plaintiff Higround Pte.;

    b.   declaring that Defendants' breach was willful;

    c.   enjoining future violations of the agreement by Defendants;

    d.   awarding Plaintiff Higround Pte. compensatory damages;

    e.   awarding Plaintiff Higround Pte. liquidated damages;

    f.   awarding Plaintiff Higround Pte. punitive damages;

    g.   awarding Plaintiff Higround Pte. pre- and post-judgment interest;

    h.   awarding Plaintiff Higround Pte. reasonable attorneys' fees and costs; and

    i.   awarding such other and further relief as the Court deems just and proper.

## SECOND CAUSE OF ACTION
### (Fraud by All Plaintiffs against Defendants Lee and GDA)

107. Plaintiffs repeat and re-allege the foregoing allegations contained in the preceding paragraphs as if fully set forth herein.

108. Defendants made material misrepresentations of fact regarding various transactions upon which they caused Plaintiffs to rely.

109. HCL and HPL, which plead in the alternative to its breach of contract cause of action, were both informed at various times that they were being asked to engage in a guaranteed loan transaction with one or more persons and/or entities with whom they had a fiduciary relationship, in other words a very low risk transaction for which they would be compensated with a relatively modest interest rate.

110. They were also informed that their funds would be spent on compelling and legitimate business purposes which would give rise to substantial profits and make the transaction even less risky.

111. Neither HPL nor HCL would have committed funds to an investment transaction without the proper representation, material and information.

112. The specific misrepresentations they received and upon which they relied include, but are not limited to, those set forth below.

    a.  <u>For HPL:</u>

100. In the Loan Collateral Agreement, Stonefort agreed that it would provide matching collateral as comfort. *See* Exhibit C.

101. However, Stonefort never provided, nor intended to provide, the collateral as specified in the Loan Collateral Agreement. *See supra* ¶ 59.

102. Also, in the Joint Venture Agreement, Stonefort was mentioned as having experience in the entertainment industry and the business of media distribution and marketing and, in particular, media content distribution. *See supra* ¶ 28.

103. However, upon information and belief, Stonefort was not in such a business, but in the businesses of asset management and general trading. *See supra* ¶ 29.

104. Also, in the Collateral Agreement and Joint Venture Agreement, Lee and

Stonefort agreed that they would seek film production and/or distribution opportunities for Plaintiff in ASEAN and the Middle East. However, this never happened. *See supra* ¶ 24-25.

b. <u>For HCL:</u>

105.  In his email to Woo on April 15, 2019, Lee stated that the compensation method would be determined periodically on a project-basis, including the general loan. *See* Exhibit K. Also, per the Term Loan Agreement's terms dated April 25, 2019, GDA would borrow $5 million USD with interest at a rate of 7% per annum. *See* Exhibit A. However, Defendants Lee and GDA never paid the entire loan principal amount plus interests as agreed. *See supra* ¶ 72,76.

106.  Defendants intended to induce Higround to rely upon these misrepresentations, and Higround did rely upon them. *See* Exhibits K, L.

107.  In reliance on these misrepresentations, Plaintiffs expended a significant sum of $5,000,000 USD. *See supra* ¶ 42-43.

108.  Defendants returned only $1,267,698.79 USD to present, and Plaintiff has been damaged as a result of these misrepresentations, which were made willfully and maliciously. *See supra* ¶ 66.

**WHEREFORE**, Plaintiffs respectfully request that this Court enter a judgment:

a.  declaring that Defendants intentionally defrauded Plaintiff;

b.  declaring that Defendants' fraud was willful;

c.  enjoining future acts of fraud by Defendants;

d.  awarding Plaintiffs compensatory damages;

e.  awarding Plaintiffs liquidated damages;

f.  awarding Plaintiffs punitive damages;

g.   awarding Plaintiffs pre- and post-judgment interest;

h.   awarding Plaintiffs reasonable attorneys' fees and costs; and

i.   awarding such other and further relief as the Court deems just and proper.

### THIRD CAUSE OF ACTION
### (Rescission for All Plaintiffs against Defendants Lee and GDA)

109.   Plaintiffs repeat and re-allege the foregoing allegations contained the preceding paragraphs as if fully set forth herein.

110.   Defendants misrepresented, concealed or didn't disclose a material fact that the Term Loan Agreement was in fact, a risky investment in the DAL.  *See supra* ¶ 17.

111.   Defendants intended to deceive Plaintiffs.

112.   An injury resulted from justifiable reliance by Plaintiffs because Defendants returned only $1,267,698.79 USD, causing injury in the amount of $3,732,301.21 USD. *See supra* ¶ 66.

**WHEREFORE**, Plaintiffs respectfully request that this Court enter a judgment:

a.   declaring that Defendants intentionally converted property belonging to Plaintiffs;

b.   declaring that Defendants' conversion was willful;

c.   enjoining future acts of conversion by Defendants;

d.   awarding Plaintiffs compensatory damages;

e.   awarding Plaintiffs liquidated damages;

f.   awarding Plaintiffs punitive damages;

g.   awarding Plaintiffs pre- and post-judgment interest;

h.   awarding Plaintiffs reasonable attorneys' fees and costs; and

i.   awarding such other and further relief as the Court deems just and
proper.

## FOURTH CAUSE OF ACTION
**(Conspiracy for All Plaintiffs against All Defendants)**

113.  Plaintiffs repeat and re-allege the foregoing allegations contained in the preceding
paragraphs as if fully set forth herein.

114.  Defendants agreed between themselves to take actions in furtherance of fraud and
conversion against Plaintiffs.

115.  Defendants took specific actions, to wit, fraud and conversion, in furtherance of their
Agreement to inflict a wrong against Plaintiffs.

116.  Plaintiffs were damaged as a result of this conspiracy between the Defendants.

**WHEREFORE**, Plaintiffs respectfully request that this Court enter a judgment:

a.   declaring that Defendants conspired to commit torts against Plaintiff;

b.   declaring that Defendants' conspiracy was willful;

c.   enjoining future acts of conspiracy by Defendants;

d.   awarding Plaintiffs compensatory damages;

e.   awarding Plaintiffs liquidated damages;

f.   awarding Plaintiffs punitive damages;

g.   awarding Plaintiffs pre- and post-judgment interest;

h.   awarding Plaintiffs reasonable attorneys' fees and costs; and

i.   awarding such other and further relief as the Court deems just
and proper.

## FIFTH CAUSE OF ACTION
**(Accounting for All Plaintiffs against Lee and GDA)**

117.    Plaintiffs repeat and re-allege the foregoing allegations contained in the preceding
        paragraphs as if fully set forth herein.

118.    Defendants have sole and exclusive control over business records relating to the business
        activity described herein.

119.    Plaintiffs cannot determine the full extent of their damages without access to the books and
        records of the defendants.

120.    Therefore, Plaintiffs seek a court-ordered accounting of such books and records as they
        pertain to the marketing and sales of the goods at issue herein.

**WHEREFORE**, Plaintiffs respectfully request that this Court enter a judgment:

    a.   declaring that Defendants have sole and exclusive control over important
        records relating to Plaintiffs' business operations;

    b.   directing the appointment of an auditor who shall provide an accounting of
        such records to Plaintiffs;

    c.   awarding Plaintiffs reasonable attorneys' fees and costs; and

    d.   awarding such other and further relief as the Court deems just and proper.

## SIXTH CAUSE OF ACTION
### (Breach of Fiduciary Duty and Duty of Loyalty for All Plaintiffs against Defendants Lee and GDA)

121.    Plaintiffs repeat and re-allege the foregoing allegations contained in the preceding
        paragraphs as if fully set forth herein.

122.    Defendants stood in a position of trust vis-à-vis Plaintiffs in regard to the actions
        complained of herein. Under the Consulting Services Agreement, as a business
        consultant, Lee has reposed trust or confidence in Plaintiffs who thereby
        gained a resulting superiority or influence over Plaintiffs.

123.   Defendants owed Plaintiffs a duty of loyalty as described herein. Lee was

under a duty to act for or to give business advice for Plaintiffs within the scope of relation.

124.  Defendants knew that Plaintiffs had granted them certain authority and accepted certain

risks and costs. Plaintiffs transferred $5 Million USD to GDA and Lee for the

consulting service for investment in the DAL. *See supra* ¶ 42-43.

125.  Defendants violated their fiduciary duty and duty of loyalty to Plaintiffs. Defendants only

returned a total of $1,267,698.79 USD, causing injury in the amount of $ 3,732,301.21.

*See supra* ¶ 66.

126.  Plaintiffs were damaged as a result of this violation.

**WHEREFORE**, Plaintiffs respectfully request that this Court enter a judgment:

    a.   declaring that Defendants intentionally breached their fiduciary obligations to Plaintiffs and their duties of loyalty to Plaintiffs;

    b.   declaring that Defendants' actions were willful;

    c.   enjoining future acts of breach of fiduciary duty by Defendants;

    d.   awarding Plaintiffs compensatory damages;

    e.   awarding Plaintiffs liquidated damages;

    f.   awarding Plaintiffs punitive damages;

    g.   awarding Plaintiffs pre- and post-judgment interest;

    h.   awarding Plaintiffs reasonable attorneys' fees and costs; and

    i.   awarding such other and further relief as the Court deems just and proper.

**<u>SEVENTH CAUSE OF ACTION</u>**
**Alternative to First Cause of Action, Quantum Meruit, Unjust Enrichment and Constructive Trust for HPL as Against Defendants Lee and GDA**

    a.   <u>Quantum Meruit and Unjust Enrichment</u>

127.  Plaintiffs repeat and re-allege the foregoing allegations contained in the preceding

       paragraphs as if fully set forth herein.

128.  Defendants obtained property belonging to Plaintiffs, $5 Million, and earned income,

       without paying proper compensation to Plaintiffs. *See supra* ¶ 42-43.

129.  Defendants reaped profits from the wrongful disposition of Plaintiffs' property which

       were not paid to or shared with Plaintiffs. Defendants only returned a total of

       $1,267,698.79 USD, causing injury in the amount of $ 3,732,301.21. *See supra* ¶ 66.

130.  Plaintiffs were damaged as a result.

       b.   Constructive Trust

131.  There was a confidential or fiduciary relationship between Plaintiffs and Defendants.

132.  Defendants Lee and GDA promised that they would return interests plus the principal.

133.  Plaintiffs sent $5Million USD to Defendants in reliance on that promise; and

       *See supra* ¶ 42-43.

134.  Defendants only returned a total of $1,267,698.79 USD in the years and therefore,

       Defendants were unjustly enriched. *See supra* ¶ 66.

**WHEREFORE**, Plaintiffs respectfully request that this Court enter a judgment:

       a.   declaring that Defendants received financial benefits from Plaintiffs to

            which they were not entitled;

       b.   declaring that Defendants' actions were willful;

       c.   enjoining future receipts of benefits by Defendants;

       d.   awarding Plaintiffs compensatory damages;

       e.   awarding Plaintiffs liquidated damages;

       f.   awarding Plaintiffs punitive damages;

g.  awarding Plaintiffs pre- and post-judgment interest;

h.  awarding Plaintiffs reasonable attorneys' fees and costs; and

i.  awarding such other and further relief as the Court deems just and proper.

## EIGHTH CAUSE OF ACTION

**Violation of the Securities Exchange Act 10(b), 20(a), SEC Rule 10b-5 for All Plaintiffs as Against Defendants Lee and GDA**

145.  Plaintiffs repeat and re-allege the foregoing allegations contained the preceding paragraphs as if fully set forth herein.

146.  Section 10(b) of the Exchange Act makes it unlawful "to use or employ, in connection with the purchase or sale of any security ... any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors." 15 U.S.C. § 78j(b).

147.  The Term Loan Agreement for the DAL was an investment contract, and therefore a security, within the meaning of the Securities and Exchange Act, because it provided for the investment of money in a common enterprise with a reasonable expectation of profits to be derived from the entrepreneurial or managerial efforts of others.

148.  Under Lee's direction, HCL created HPL under the relevant laws of Singapore to facilitate a nominal transaction for investment in the DAL. *See supra* ¶ 16.

149.   Plaintiffs invested $5,000,000 in the DAL under  Lee's direction, through which it reasonably expected to earn profits in the form of periodic interest payments. *See supra* ¶ 16.

150.  In entering the Term Loan Agreement, Plaintiffs relied on the managerial and entrepreneurial efforts of Lee, Stonefort, and their affiliates to manage the

digital assets and to exercise project proposals that would generate profits for Plaintiffs without Plaintiffs' prior approval.

151.  Plaintiffs' expectation was strengthened by brochures and explanations that Lee sent via email. *See* Exhibits K, F, L.

152.  Because Defendants held themselves out as experts in the blockchain and financial management and technology, Plaintiffs relied on their purported expertise.

153.  Defendants made numerous materially false and misleading statements via emails in connection with and as inducement for Plaintiffs' purchase of a security under the Term Loan Agreement.  *See* Exhibits K and L.

154. On April 25, 2019, Lee falsely promised that GDA would buy the DAL with Plaintiffs' money and return profits as a form of interest under the Term Loan Agreement and Consulting Services Agreement discussed on April 15, 2019. *See* Exhibits A, H, K, S; *See supra* ¶ 36. Even if GDA did purchase the DAL with the funds transferred by Plaintiffs, Lee never returned profits in the form of interest as he promised. *See* Exhibit J.

155.  Also on April 25, 2019, Defendants Lee and GDA falsely represented under the Term Loan Agreement, that the principal, $5,000,000, would be repaid at maturity and that Plaintiff Higround Pte. would earn periodic interest at a rate of 7% per annum. *See* Exhibit A. This never happened because, as stated above,   Lee and GDA failed to even repay the full principal. *See supra* ¶ 66.

156.   GDA had no intention of fulfilling its material obligations under the Term Loan Agreement at the time it was entered into, as evidenced by the following:

      a.   GDA had been dormant since its incorporation. *See supra* ¶ 63.

b.  On July 31, 2019, Lee sent an email to Woo asking him not to mention the "IC

Memo" or "broker-dealer and asset management firm" to BRV to avoid "intense,

needless due diligence" as well as accusations of negligence and/or fraud. *See*

*supra* ¶ 45.

c.  In the same email, Lee stated that "we should try not to focus on [the] 'guarantee'

to BRV people (KY/PM) since they may use deal aspects to make life hard for us

…. Let's not give too much information to [the Project Manager]." *See* Exhibit L.

d.  On June 12, 2023, Lee sent a brochure of Neon Partners and its affiliates, stating

that they were specialists and representing its address as 1250 Broadway, New

York, NY 10001. *See* Exhibit F. In fact, Genesis-Neon Group, including Neon

Partners, does not even have its own physical office.

e.   Lee continuously stated in his emails that he would return the amount of

Plaintiffs' initial investment plus interests through other funding sources. For

example, in February 2021, Lee promised to provide stock in Jules Corporation as

a pledge. In April 2022, Lee promised that he would be able to secure necessary

funding from Petra Eco. However, Lee's promises were never performed, and

GDA did not return a substantial portion of the Loan. *See supra* ¶ 71.

f.  In January 2022, after Plaintiffs finally demanded return of the money, Lee falsely

stated that GDA was in the process of arranging for the return of the $4.75 million

outstanding balance. *See supra* ¶ 75.

g.  In April 2022, Plaintiffs and Defendants Lee and GDA agreed to alter the "Due

Date" of the Term Loan Agreement and to negotiate to postpone the loan

repayment schedule for the Term Loan Agreement. *See* Exhibit R. Since that time,

however, all Defendants have been silent and non-responsive to any type of

Plaintiffs' communications, precluding any further negotiation for the repayment

schedule. *See supra* ¶ 76.

157. Each of the above statements were material because they impacted the likelihood that the

contemplated loan would be repaid, such that a reasonable investor would have considered

them important.

158. Plaintiff would not have agreed to purchase the security described in the Term Loan

Agreement absent Defendants' false and misleading statements.

159. In reliance on this purported guarantee, Plaintiff transferred the funds to Stonefort under

GDA's instructions. *See supra* ¶ 42-43.

160. Defendants Lee and GDA breached their fiduciary duties in connection with the sale of

securities by failing to repay Plaintiffs and by making material misrepresentations in

furtherance of their fraudulent scheme.

161. Even if Higround trusted Lee to make transactions on its behalf without prior

approval, Lee never disclosed to Plaintiffs details of any of these purported

transactions, despite Plaintiffs' subsequent demands for information. *See* Exhibit N; *See*

*supra* ¶ 73-76.

162. The false and misleading statements were material due to the substantial likelihood that

despite Defendants' representations, the Term Loan Agreement was not intended to be a

loan with an anticipated maturity date, but an investment that ran the risk of total loss. *See*

Exhibit L.

163. The false and misleading statements were also material because they pertained to

Defendants' management of digital assets and in fact specified digital asset types that a

reasonable investor would view as having significant value, such as Ethereum and

Hyperledge.

164. Defendants' false representations that some of these affiliated companies were located in

New York, an expensive metropolitan area, when the companies did not even have their

own physical offices, were individually and collectively material; Plaintiffs would not have

transacted business with them had they been aware of this. *See* Exhibit F.

165.  Lee only provided a company brochure of Neon Partners, an incorporation

certificate of Invensys Investments Ltd., a memorandum of association of Invensys

Finance Investments LLC, and a memorandum of association of Invensys Investments

Ltd., an affiliate of Stonefort. *See* Exhibits E, F.

166. On April 5, 2022, without providing any detailed transaction information, Lee

claimed that the book value of the license was $5,000,000 USD yet failed to provide any

relevant information, instead offering comparisons with other kinds of digital assets and

markets. *See* Exhibit J.

167. Relying on Defendants' material false statements, including a promise to return profits,

Plaintiffs transferred $5 million USD to Defendants, only $1,267,698.79 USD of which

was repaid. As a result, Defendants' fraudulent scheme caused injury to Plaintiffs. *See supra*

¶ 66.

168. Defendants Lee and GDA were primary violators under the Securities Exchange Act of

1934 because   GDA is a shell company that was used as a vehicle for Lee's fraud.

169. The transaction was "domestic" within the meaning of the Securities Exchange Act of

1934 because the parties incurred irrevocable liability in carrying out the transaction within

the United States.

170. Furthermore, the parties agreed on October 23, 2020, to the exclusive jurisdiction of the state or federal courts located within New York County, New York for any disputes arising in connection with the agreement. *See* Exhibit G.

171.  Lee, a US citizen, repeatedly communicated with Plaintiffs and BRV, a US investor, about the investment. Even if Plaintiff transferred money from a bank in Singapore, Plaintiffs' wire transfers were carried out under BRV's control and direction which in turn was directed by  Lee.

172.  Lee directed that Higround transfer $5 million USD to Stonefort for the benefit of GDA, a shell company. *See* Exhibit H. All communications regarding the wire transfer were sent to Lee in New York.

173. On April 26, 2021, Lee sent $499,990 to Plaintiffs through Hur, Lash & Choe, LLP. *See* Exhibit P.

174. On May 17, 2021, Lee sent an additional $249,990 to Plaintiffs, again through Hur, Lash & Choe, LLP. *See* Exhibit P.

175.  In an email to Chung on December 15, 2020, Hur, Lash & Choe, LLP claimed to be GDA's attorneys. *See* Exhibit T.

176. By reason of the foregoing, Lee and GDA, acting with Stonefort, individually and in concert, violated Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5, Section 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. §78t(a).

**WHEREFORE**, Plaintiffs respectfully request that this Court enter a judgment:

  a.  awarding Plaintiffs out-of-pocket loss, the difference between price paid and actual value at the time of Plaintiffs' purchase;

b.   awarding Plaintiffs actual damages;

c.   ordering the Defendants, jointly and severally, to disgorge, with

    prejudgment interest, all ill-gotten gains derived from the violations;

d.   permanently restraining and enjoining Defendants from violating

    Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5

    17 C.F.R. § 240.10b-5 thereunder;

e.   awarding Plaintiffs consequential damages, including lost dividends,

    brokerage fees, and taxes;

f.   awarding Plaintiffs rescissory measure of damages, including the

    amount paid plus interest and other expenses attributable to

    Defendants' fraud;

g.   awarding Plaintiffs restitution of the securities;

h.   awarding Plaintiffs reasonable attorneys' fees and costs; and

i.   awarding such other and further relief as the Court deems just and

    proper.

Dated: December 15, 2023

**KIM & BAE, P.C.**
Attorneys for Plaintiffs

By: _____/s/ *Bong June Kim*_____
       Bong June Kim, Esq. (BK-6989)

## JURY DEMAND

Plaintiffs demand a trial by jury.

Dated: December 15, 2023

> **KIM & BAE, P.C.**
> Attorneys for Plaintiffs
>
> By: _____/s/ *Bong June Kim*_____
> Bong June Kim, Esq. (BK-6989)

## VERIFICATION

Hae Suk Chung, of full age, hereby certifies:

I am the president of HIGROUND CO., LTD, Plaintiff in the above-entitled matter.  I have held this position since 2018.  My responsibilities include monitoring the contractual agreements and financial records of HIGROUND CO., LTD.  I have read the foregoing Amended Complaint and certify that the allegations contained therein are true to the best of my knowledge, information and belief.

I certify that the foregoing statements are true. I am aware that if any statement made herein is willfully false, I am subject to punishment.

Dated:  December 15, 2023

1